## Richmond

NANCY GAIL DUTTON

v.

WILLIAM ANDERSON LOCKER

Record No. 800174.

EDMUND LEROY SCOTT, JR.

v.

NANCY GAIL DUTTON AND
WILLIAM ANDERSON LOCKER

Record No. 800186.

AMERICAN INTERINSURANCE EXCHANGE

v.

NANCY GAIL DUTTON

Record No. 811794.

December 3, 1982.

Present: Carrico, C.J., Cochran, Poff, Compton, Thompson, and
Stephenson, JJ., and Harrison, Retired Justice.

*W. W. Whitlock (W. W. Whitlock, P.C.*, on brief), for appellant. (Record No. 800174.)

*Bruce D. Rasmussen (Michie, Hamlett, Donato & Lowry*, on brief), for appellee. (Record No. 800174.)

*John W. Zunka (Taylor, Brooks, Zunka & Murray*, on briefs), for appellant. (Record No. 800186.)

*W. W. Whitlock; Bruce D. Rasmussen (W. W. Whitlock, P.C.*, on brief), for appellees. (Record No. 800186.)

*John W. Zunka (Taylor, Brooks, Zunka, Ltd.*, on briefs), for appellant. (Record No. 811794.)

*W. W. Whitlock (W. W. Whitlock, P.C.*, on brief), for appellee. (Record No. 811794.)

HARRISON, R.J., delivered the opinion of the Court.

These cases arise out of the same motor vehicle accident and, although separately appealed, for the purposes of this opinion will be treated as consolidated cases.

Nancy Gail Dutton alleges that she was permanently injured in an automobile accident that was caused by the negligence of defendants, William Anderson Locker and Edmund Leroy Scott, Jr. The jury returned a verdict in favor of Dutton against Locker in the amount of $45,000 and found in favor of Scott. The trial court set aside the verdict as contrary to the law and evidence and granted the plaintiff a new trial. Upon a retrial of the case, a second jury returned a verdict for Dutton against Scott in the amount of $100,000, and found in favor of Locker. The trial court entered judgment in accordance with the jury's verdict. Thereafter, Dutton sought to collect from Scott and his liability insurance carrier, American Interinsurance Exchange, the judgment she had obtained, and the court below entered judgment against the carrier for the full amount of its policy limits and costs.

Dutton assigns error to the action of the trial court in the first trial in failing to order a new trial as to damages only as to the defendant Locker and in failing to order a new trial on all issues as to the defendant Scott. Dutton further says that the court erred in the second trial in not striking the evidence as to Locker and entering summary judgment in her favor against both Locker and Scott for the amount of damages found by the second jury.

In his appeal, Scott alleges that the trial court erred in setting aside the verdict of the first jury in his favor and ordering a new trial, and erred in refusing to set aside the verdict of the jury against him in the second trial.

American Interinsurance Exchange, in its appeal, alleges that the trial court erred in granting judgment to Dutton while an appeal was pending from the judgment Dutton obtained against its insured, Scott.

In *Bostic* v. *Whited*, 198 Va. 237, 238, 93 S.E.2d 334, 335 (1956), we said:

> Under these circumstances it is the practice of appellate courts to consider the record and to pass upon errors in the order committed, and to reverse the judgment of the trial court for material error not waived whereby the party appealing is aggrieved. This is done without looking into subsequent proceedings. [Citation omitted]. Thus if it is discov-

ered that the court erred in setting aside the verdict in the first trial either because of the mistaken belief that the verdict was contrary to the evidence or for some other supposed error committed, the appellate court will annul the proceedings subsequent to the first verdict and enter judgment on it. [Authorities omitted].

The proceedings of the first trial disclose that the accident occurred about 7:30 p.m., on July 2, 1977, in Louisa County on Virginia State Highway # 22 at a point where this highway intersects Highway # 675. Nancy Gail Dutton was a passenger in an automobile owned and operated by her husband, Jerrold A. Dutton. The car was proceeding in a westerly direction. Edmund Leroy Scott, Jr., was operating a Honda motorcycle and proceeding east. William Anderson Locker was operating a Toyota automobile behind Scott.

Virginia State Trooper J. W. Chaney described the highway as a straight, two-lane, paved road, with a slight downgrade as one travels east. He said the shoulders of the highway are 6 feet wide and that the accident between the Dutton and Locker vehicles occurred in the westbound lane of Route 22 near the intersection of the two highways. He noted that the passing zone for eastbound traffic began just west of the intersection. Chaney also testified that one tenth of a mile west of the intersection is a hillcrest and that the highway between the hill and the point of the accident is straight and visibility is unimpaired for that distance.

There were no eyewitnesses to the accident other than the occupants of the vehicles. It is admitted that the point of impact occurred in the westbound lane, when Locker's vehicle slid out of control across the center line of the highway, and its left front struck the left rear panel of the Dutton automobile.

Trooper Chaney found skidmarks on the road which indicated that Locker's car, after the application of brakes, first veered off the hard surface of the highway on its right side and then "made a broadside skid" to the left, crossed the center line and struck the oncoming vehicle. Locker's explanation of the accident to the trooper was that he was following a motorcycle which made "a dead stop" in front of him, and he said that when he attempted to brake and stop he skidded into the westbound lane and struck the Dutton car. Chaney said that Locker estimated his speed at 50-55 mph, and said that he was approximately four and one-half car

lengths behind the motorcycle when its brake light came on. The officer did not observe Scott at the scene of the accident and obtained no statement from him. Chaney said that Mr. Dutton gave him a statement a few days after the accident in which he said that he saw the motorcycle approaching with Locker behind it when they were about 100 yards away; that the motorcycle did not appear to be going very fast; and that Locker was pretty close, "no more than three car lengths," behind it.

Nancy Dutton testified that she was looking elsewhere at the time of the accident and recalled only observing the left front of the Locker car when it crossed over the center line and struck them. Mr. Dutton testified that he observed both the motorcycle and car approaching. He was unwilling to estimate the speed of the vehicles but said that Locker was overtaking the motorcycle, and that the car and motorcycle were no more than a car length apart when the motorcycle passed him. He did not see the motorcycle stopping and did not know whether the motorcycle did in fact stop. In describing the accident, he said: "I saw a motorcycle and a car coming from the opposite direction and just as I got to the motorcycle and the car the car shot out and swerved out from around the motorcycle. I didn't actually see him hit me because I had almost passed him when he hit me." He said that the impact caused him to lose control of his car and that his vehicle overturned, seriously injuring his wife.

Locker testified that he was twenty-one years old, and was en route to his home, traveling east on Route 22 when the accident occurred. He said that he was driving at a speed of approximately 50 mph. He described the highway as hilly and said that he observed Scott in front as the motorcycle went over a hill and out of his sight on the highway; that he followed Scott; and that "as I came over the hill I seen him then." (Chaney testified that this hill was one-tenth of a mile from the scene of the accident.) Locker also said: "I saw him approximately I'd say about 100 to 120 feet from where the accident occurred," and that, as he got closer to the motorcycle, "I seen his brake light pop on and I was within four to five car lengths then. I had already geared down because I had seen him, you know." Locker had described his vehicle as having a "four-speed transmission." Locker also testified that when he saw Scott, 100 to 120 feet away, "I saw I was gaining on him so I changed gears, I came from high gear to third gear."

Additionally, Locker testified that when he got to within four to five car lengths of the motorcycle, "I seen he had come to a stop or it wasn't quite a stop and I applied my brakes and I began to skid, because I had already looked out to see if I could go around him and I seen a car coming up the road." Locker said that upon the application of his brakes, his car "went into a straight skid at first and then my right front wheel went off the shoulder on the right-hand side of the road." He said that when he pulled his car back onto the road, it went across into the westbound lane and struck the Dutton vehicle. At the time of impact, he estimated that his car was approximately one-half of a car length from Scott and had almost stopped.

Locker was questioned closely about whether the motorcycle stopped in the highway and at what point. He said the motorcycle looked to him "like it was stopping." When asked if it did stop, he answered "it came to a stop, almost a complete stop" in the center of the right-hand lane. Locker repeatedly testified that when the brake lights of the motorcycle came on he was four to five car lengths behind the motorcycle and that to him "it looked like he [Scott] had stopped when I slammed my brakes on." When asked why, when he noticed that he was gaining on the motorcycle, he did not apply brakes instead of gearing down, Locker replied: "Not then because to me it looked like he was still moving."

Defendant Scott was a controversial witness. He was not present during the first half-day of the trial, having not been summoned by either the plaintiff or Locker, and his presence apparently was not then desired by his own counsel. At the request of plaintiff, the trial court permitted his discovery deposition to be read into evidence as a part of plaintiff's case-in-chief. In this deposition, Scott said that he and Locker were going east on Route 22 toward Charlottesville when Locker passed him, failed to get back on his side of the road, and struck the oncoming Dutton vehicle which was headed east. After the discovery deposition had been read and the plaintiff had rested her case, Scott appeared in court and testified. He stated that he had been in Louisa and available to testify all day. The witness, age 39 and unemployed, testified he had a 7th grade education and that he was not involved in any way in the accident. He said he thought nothing about the case until shortly before trial when someone called him on the phone and kept him for about twenty minutes, acting like "they wanted to make me to have something to do with it which I didn't know

nothing." He admitted that the statement he made in his deposition was not true, and was given because "you all figured that I had something to do with it," and he felt "they were trying to make me say something."

The operator of the motorcycle was originally made a party defendant to plaintiff's motion for judgment as "John Doe." On December 14, 1978, she filed an amended motion, identifying Scott as the operator and substituting him for John Doe.

In substance, Scott's testimony before the jury was that the accident happened a long time ago and "being I wasn't involved in it, it wasn't nothing for me to remember no ways." He said that he remained at the scene until two rescue squads, the wrecker, and the trooper arrived, and then he left. His motorcycle was not struck or damaged in the accident. There is no testimony that either Scott, Locker, or Dutton intended to turn off Route # 22 at its intersection with Route # 675.

Mrs. Dutton and her attending physician, Dr. Frank McCue, testified to the injury she sustained to her hand, wrist, and forearm. She had worked as a secretary and clerk-typist and had planned to seek employment again after her children were older. She was in the hospital for twenty-seven days, during which time several operational and surgical procedures were performed on her. She incurred medical expenses in excess of $6400. Additional surgical procedures to reduce the extent of her disability may be necessary at a cost of approximately $3000. The verdict of $45,000 is not excessive in view of the length of her period of hospitalization, the nature, permanence, and seriousness of the injury, and the fact that plaintiff has an estimated 50% permanent partial impairment of her arm and hand. Neither is the amount of the award so out of proportion with the injuries suffered and damages sustained as to suggest that it is not the product of a fair and impartial decision.

The issues involved are solely questions of fact. Neither the plaintiff nor her husband was guilty of any negligence that contributed to cause the accident. The position of the defendant Scott is that he was in no way involved in this accident and did nothing to proximately cause or contribute to its happening. Plaintiff Dutton alleges that the accident was caused by the joint negligence of both Locker and Scott.

Locker sought to convince the jury that Scott stopped his motorcycle in the middle of the eastbound lane without first seeing

that such movement could be made in safety, and without giving a signal plainly visible to Locker of his intention to stop.

It is apparent that at one time Locker gave some thought to passing the motorcycle but abandoned the maneuver when he observed the approaching Dutton vehicle. The jury could have concluded that Locker was then too close to the motorcycle and that this accounted for Locker's sudden application of brakes and loss of control of his vehicle.

The jury may have found that although Scott applied his motorcycle brakes, preparatory to stopping, the motorcycle was never completely stopped or, if stopped, that had Locker been driving at a reasonable speed, keeping a reasonable lookout ahead, and a reasonable distance between his vehicle and the motorcycle, he would have been able to stop his automobile in an orderly manner without losing control.

While Locker alleges that Scott's act in precipitately stopping his motorcycle caused Locker to lose control of his car, the jury found otherwise. Locker admitted that he operated his vehicle at a speed of 50 mph on a hilly road; that he saw the motorcycle in front of him; and that when it was 100-120 feet away, he observed that he was gaining on the motorcycle and changed gears instead of applying his brakes. Locker testified to seeing the brake light of the motorcycle come on when he was a distance of some four or five car lengths away.

The principles which control our decision here are well established and were stated in *Commonwealth* v. *McNeely*, 204 Va. 218, 222, 129 S.E.2d 687, 689-90 (1963), where we said:

But the power conferred on the trial judge under Code § 8-352 [now Code 8.01-430] to set aside a jury verdict and enter final judgment can only be exercised where the verdict is plainly wrong or without credible evidence to support it. If there is a conflict in the testimony on a material point, or if reasonable men may differ in their conclusions of fact to be drawn from the evidence, or if the conclusion is dependent on the weight to be given the testimony, the trial judge cannot substitute his conclusion for that of the jury merely because he would have voted for a different verdict if he had been on the jury. The weight of a jury's verdict, when there is credible evidence upon which it can be based, is not overborne by the trial judge's disapproval. The question involved under

such circumstances is one of fact for determination by the jury, and their verdict cannot be disturbed by either the trial court or by this Court, and if improperly set aside by the trial court it will be reinstated by this Court. [Citations omitted]

*Accord, Coleman* v. *Blankenship Oil Corp.*, 221 Va. 124, 267 S.E.2d 143 (1980); *Lane* v. *Scott*, 220 Va. 578, 260 S.E.2d 238 (1979), *cert. denied*, 446 U.S. 986 (1980).

■ We think it clear that fairminded men could differ as to the conclusions of fact to be drawn from the evidence given by defendant Locker, Mr. Dutton, and Trooper Chaney. It was the responsibility of the jury to hear the evidence, weigh the testimony, and find the facts. We cannot say that the verdict of the jury finding that Locker was negligent is plainly wrong or without credible supporting evidence. While the conduct of defendant Scott is reprehensible, the fact that he may have deposed or testified falsely does not establish negligence. The jury had the opportunity to observe his manner and demeanor in testifying and also had the responsibility to weigh and determine the credibility to be given his deposition and testimony. It found him free of actionable negligence.

We do not address Dutton's assignment of error which questions the action of the court in granting Locker an instruction on sudden emergency. Obviously the plaintiff, having recovered a verdict against Locker, was not prejudiced thereby.

The jury was fully and fairly instructed. There is nothing in the record to show that the jury was actuated by passion, prejudice, or corruption. Nor is there anything to indicate that it misconceived or misunderstood the facts or the law of the case.

Accordingly, the verdict for $45,000 returned by the jury at the first trial in favor of Nancy Gail Dutton against William Anderson Locker is reinstated, as is its verdict in favor of Edmund Leroy Scott, Jr. Judgment will be entered thereon. All proceedings subsequent to these verdicts will be set aside, annulled, and final judgment entered.

*Reversed and final judgments.*